Filed 7/23/24  P. v. Watson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILL ANTHONY WATSON,<br><br>    Defendant and Appellant. | A165995<br><br>(Alameda County<br>Super. Ct. No. 17CR003246) |

Defendant Will Anthony Watson was convicted by jury of second degree murder of Gregory Ignacio, Jr., and sentenced to 40 years to life.  On appeal, defendant contends the trial court: (1) erred in admitting witness identifications into evidence; (2) erred in preventing impeachment and cross-examination of a witness; (3) abused its discretion in not striking a firearm enhancement; and (4) violated defendant's constitutional and statutory rights to be present throughout his sentencing hearing.  We affirm.

**BACKGROUND**

*The People's Case*

Prosecution witnesses testified to the following events: In September 2016, S.H. met her cousin T.L. and her friend T.J. in Berkeley to "hang out

1

and go[] to purchase some weed."[1]  T.J. arrived with her friend Gregory Ignacio, Jr., who S.H. and T.L. knew only by the nickname "G".

T.J. eventually called Jacob Felipe,[2] from whom she and T.L. had previously bought marijuana.  The three girls and Ignacio walked about four or five blocks to meet Felipe to make the purchase.  It was late afternoon or early evening, but still light.

The group met Felipe, who was alone, near some apartment buildings.  They spent no more than five minutes buying the marijuana.

The three girls started walking away, but Ignacio stayed and spoke briefly with Felipe.  To T.J., it looked as though Ignacio and Felipe were "chatting."  T.L. described their exchange as a "regular conversation, not hostile."  S.H. did not remember any fights, arguments, or hostilities between Ignacio and Felipe.

Ignacio then rejoined the trio, and the four continued walking back toward where they had started.  Shortly thereafter, a man, later identified as defendant, approached them from behind—coming from where they had purchased the marijuana.  As he approached, he spoke to Ignacio.  T.J. heard him say something like, " 'This is Fairview' " and " 'Hey, you got a problem with Jake?' "  She heard Ignacio respond, " 'Who are you?' "  T.L. initially "heard a little bit of yelling.  It was inaudible at that time."  As the man got closer, she heard him twice yell at Ignacio, " 'Do you have a problem with J?' "  She described the man as "[a]ngry, hostile" and "three, four feet away" from them.  S.H. could not make out what the man was saying but she could tell,

---

[1] At the time, S.H., T.J., and T.L. were teenagers, and T.J. and T.L. were minors.  We therefore refer to these individuals by their initials.

[2] Felipe is referred to as Jake or "J" throughout the reporter's transcript.  We refer to him by his last name.

"by the actions and the hands," the interaction "was very hostile." Ignacio appeared shocked.

As the girls turned to continue walking, they saw the man "grab his pocket" or reach for "his waistband," "near where like your pocket on your pants would be." T.J. saw "two red flashes." T.L. saw the man grab a handgun and point it at Ignacio. She then heard gunshots. S.H. heard "a pop, a loud pop," which she recognized as gunshots. All three ran.

When they looked back at Ignacio, he was lying on the ground, bleeding. All three spoke with a 911 operator.[3] T.J. described the shooter as having a "fairly white" "skin tone," a "sharp, a pointy nose," and wearing a "hoodie and a cap." She recalled seeing a curl of hair "like swooped under around his ear" and thought his hair length was "a little past his ears," "quite a bit shorter" than Felipe's. T.L. said the man was White but then said he might be "Mexican or a mix," based on his skin tone. S.H. described the shooter as being "Latino or White," having "a very pointy nose," and wearing a hat.

A few months after the shooting, Berkeley Police arrested T.J. for "conspiracy" to commit murder, based on their mistaken belief she had placed a call to Felipe after the killing. During the almost 13 hours she was held at the police station, Berkeley Police Sergeant Jesse Grant conducted two interviews. During the first, T.J. repeatedly said Felipe was not the shooter. After the interview, she was placed in a holding cell. During the second interview, after Grant explained what "conspiracy to commit murder means," T.J. identified Felipe, testifying at trial, "At that point, after thinking, 'Wow,

---

[3] T.J and S.H. made separate 911 calls which were played for the jury. T.L. did not call 911 herself but spoke with an operator, and her portion of the call was also played for the jury.

this is what it is'—I felt the officers presented me with so many pictures of Jake after many things I told them, I just gave in. 'Since you guys are telling me it's this person, it is this person. I want to go home.' " When asked if she identified Felipe because he was the shooter, she testified, "No," but "because I wanted to go home. And since that is what the officers had told me, it was like I was forced to believe it." T.J. also testified, however, that she still believed Felipe was involved, but he was not the shooter.

About four months after the shooting, in January 2017, the Berkeley Police Department showed T.L. and S.H. photo lineups. Although defendant's photograph was included in both, neither identified anyone in the lineup as the shooter. T.L. identified Felipe as the man they "bought weed from" but stated he was not the shooter. T.J. was not presented with a photo lineup.

The following month, T.J., T.L., and S.H. were taken to an in-person lineup.[4] All three sat in the viewing room; two were seated in the front row with an empty chair between them, and one was seated in the second row. They were each given a sheet with an admonition and boxes corresponding to the "participants" positions in the lineup and instructed to put an "X" for a positive identification and a "?" if they suspected the person was the shooter but were not sure.

T.J. and T.L. put question marks on box three, which corresponded with defendant's lineup position. T.J. explained she put a question mark because she was "playing it safe." Since she "didn't get a good look at this person's face, I only had a view from the side, going based off emotions, feelings, I wasn't going to put an 'X' there saying I'm confident that this is the

_____

[4] A video of the lineup was played for the jury but is not included in the record on appeal.

4

person when I wasn't so confident." She also stated defendant's "voice sounded familiar" but "much more proper." She recognized defendant's nose as being "pointy the way I remembered it" and stated his hair and skin tone were similar to the person who confronted Ignacio. T.L. explained she put a question mark because she was "not sure if that was the actual person who was involved," but told officers defendant's hair, nose, build, and skin tone matched the shooter's. She stated his "hair and the nose," which she described as "narrow and pointy" matched the shooter's. She also noted his skin tone and voice were reasons she identified him. S.H. put an "X" on the box that corresponded with defendant's position and a "?" on a filler's box. She explained she put a "?" on box one because she "must have been not sure when I seen that person or they must look . . . similar to the other person," and she put an "X" next to defendant's number because of the "dark hat with the hair," he was tall, and "his nose is pointy." When asked, if by marking box three, she was "indicating that this person looked most like the person [she] saw walk up to G" on the street? She responded, "Yeah."

Felipe testified, under a grant of immunity, that he knew the victim as "Lil G." They had gone to high school together and lived a block away from each other. Although initially close, the two had had a falling out. Between the falling out and the murder, they would occasionally see each other in the neighborhood and "just star[e]" at each other. Except on one occasion, the two never got physical. However, Felipe thought Ignacio was "trying to confront" him after the sale. Ignacio had approached Felipe at the side gate to his apartment building and "kind of hollered at me, like, 'Hey, yo, check it out. What's up?'" Ignacio then complained about Felipe's friends "mean-mugging him" or "staring hard" at him. Felipe had responded something like, " 'That's not me. I'm not your man' " and " 'Hey, I don't want any

5

problems. . . . Just leave me alone.' " At that point, the conversation ended and Felipe went into his apartment. He saw Ignacio walk back to T.J. and S.H., who were waiting on the corner, and the group started walking back up the street.

Felipe also saw defendant, who he knew from prior marijuana sales. Defendant had gotten in touch with Felipe before T.J. contacted him, and Felipe had let defendant into the gate of the apartment complex. After T.J. called, Felipe told defendant he was going to "[s]erve somebody," meaning sell them marijuana, but he would be back. When he returned, Felipe told defendant, " 'My bad. It took a little longer,' " stating "some kid"—referring to Ignacio—"got in my face and he was talking crap or something, something like that."

Defendant then looked at Felipe "funny" and began walking away. When Felipe asked where he was going, defendant asked where Ignacio was. Felipe responded, " 'Fuck you.' Like, 'Whatchu doin'? you know. I was telling him, 'Leave it alone. It's nothin',' you know. Told him to be cool." Defendant said, " 'Oh, dude, don't worry man. I'm just about to go and check him or something,' " which Felipe took to mean defendant was going to go "[c]onfront" Ignacio. He later told police that after he told defendant to "leave it alone," defendant said, " 'Nah, dude, nah. I wanna get on somebody,' " which Felipe took to mean to go and "assault somebody." Felipe followed defendant to the sidewalk, saying, " 'Just be cool. What are you doing?' " As defendant continued walking up the street, Felipe turned around and went back to his girlfriend's apartment. He later heard police sirens.

A few months before the murder, Felipe had seen defendant with a firearm. Defendant said he owned it "under his name" and possessed it legally. Felipe described the gun as a .45-caliber, semi-automatic with a

"chrome slide" or a "shiny silver type thing" that "runs like along the barrel" of the gun.

Berkeley Police Patrol Sergeant Scott Castle and his partner arrived on the scene of the shooting first and found Ignacio "down on his back in the street." Ignacio was unresponsive, and Castle began to render emergency aid. While Castle was applying a tourniquet around Ignacio's leg, paramedics arrived and took over emergency aid. Berkeley Police Officer Kevin Neff followed the ambulance to the hospital. Ten minutes after arrival, hospital staff informed him Ignacio had died.

The parties stipulated to the following: Sergeant Grant obtained a search warrant for defendant's residence. During execution of the warrant, defendant was arrested. During the search, officers seized defendant's cell phone. Grant obtained a subsequent warrant to search defendant's cell phone records and data. That data was then turned over to Berkeley Police Sergeant Andres Bejarano for analysis.

Bejarano testified as an "expert in call detail records" and use of "CellHawk," a program used to plot a "Google-type map" of the cell towers used during a phone call. Before and after the shooting, defendant made phone calls which registered on cell phone towers in the area of the shooting. The first call, made at 6:41 p.m., registered at a cell phone tower that was "approximately .29 miles or about 1550 feet" away from the location of the shooting. The second call, made at 8:03 p.m., registered at a cell phone tower that was approximately "three-quarters of a mile or .78 miles" from the location of the shooting.

Berkeley Police Department crime scene technician Anna Bolla arrived at the scene as paramedics were rendering aid to Ignacio. Near Ignacio's clothing and shoes, which had been removed by paramedics, Bolla

7

documented "two suspected .45 caliber shell casings."  Both shell casings bore the same "head stamp," which read ".45 Auto Federal."

Cary Wong, "an expert in the examination, comparison and identification of firearms, ammunition, fired ammunition, as well as the functioning of semi-automatic handguns," analyzed the two .45-caliber cartridge cases.  He determined both had been fired from the same Glock firearm.

The parties stipulated that Sergeant Grant, during the search of defendant's residence, located a "green accordion folder," which "contained a receipt for a Glock Model 21 .45 caliber semi-automatic handgun" showing defendant's name, an address, and the purchase date.  Grant "also found a dealer's record of sale of firearm or DROS paperwork for a Glock Model 21 .45 caliber semi-automatic handgun with serial number XNU275," and the paperwork showed defendant's name, and the same address and purchase date as the receipt.  The paperwork listed the color of the firearm as black.

Berkeley Police Officer Paul Jason Tillberg testified Glock 21 handguns, which come "in a black finish," are very popular and are "very easily" modified.  For example, "Cerakote is a ceramic-based paint," used "primarily for firearms because it's extremely durable" and can be used to alter the color of the slide so that it can be "rather shiny" and have a "metallic appearance."

Senior DNA Analyst Angela Butler testified as "an expert in body fluid identification, as well as the analysis, comparison and interpretation of DNA and DNA mixtures, as well as the use of eDNA Bullet probabilistic genotyping software as it relates to the analysis, comparison and interpretation of DNA and DNA mixtures."  After explaining her testing and

examination procedures, Butler opined defendant "could be included as a possible contributor to the DNA results obtained from both casings."

With respect to the first casing, "DNA evidence was at least 39,000 times more likely if it originated from [defendant] and one unknown unrelated contributor than if it originated from two unknown unrelated contributors."  In other words, the partial profile "would be 39,000 times more likely to occur if [defendant] was included as a contributor to that sample."  This figure indicated "very strong support for the inclusion of [defendant] in this mixture."  With respect to the second casing, which contained a larger sample, "the DNA evidence is at least 259 million times more likely if it originated from [defendant] and one unknown unrelated person than if it originated from two unknown unrelated individuals."  This figure indicated "extremely strong support" for the inclusion of defendant in the mixture, with "extremely strong support" being "the highest you can get."

*Defense Case*

The defense focused on undermining the reliability of the lineup identifications and challenging the reliability of T.J.'s statements during the two interviews.

Defendant elicited testimony that Sergeant Grant had assembled the photographs used in the photo lineup from the DMV data base, but another officer unfamiliar with the case showed the lineups to S.H. and T.L.  All six photos were of White males, all "appeared to be young," and all had dark hair.  The DMV photograph of defendant "look[ed] fairly different than from how he looked" in 2017.  The photo had been taken in 2013, three years before the murder and three and half years before the lineup, but it was "the only photo" of defendant Grant was able to locate.  Neither S.H. nor T.L. identified anyone in the photo lineups as the shooter.

9

With respect to the physical lineup, Grant had no part in selecting the "fillers." Instead, the Alameda County Sheriff's Department chose the fillers from the inmate jail population. Each participant wore blue Santa Rita Jail clothing and a plain black baseball cap, and each was required to walk forward, one at a time, and say, " 'This is Fairview' " and " 'You got a problem with J?' " During the lineup, the three girls were in the same room. T.L. and T.J. both put question marks next to No. 3 (defendant).

Dr. Geoffrey Loftus, a psychologist, testified as an expert "in memory and factors relating to eyewitness identification." He explained the concept of double viewing, where a witness is shown one lineup containing the suspect and then sees a second lineup in which the only person common to the two lineups is the suspect. The impact being that when a witness looks at the second lineup the suspect "may look familiar to the witness, not because he was the person that the witness saw commit the crime, but, rather, he was a person that the witness saw during the first lineup."

As for the interrogations of T.J., Grant said that during the second interview, she "couldn't think of anyone else who could be out there and does mention Jacob Felipe." And it was not until the second interview that she said the shooter was wearing a baseball cap with a "B" on it.

DISCUSSION

*In-Person Lineup*

Prior to the preliminary hearing, defendant moved to exclude "witness identifications of defendant at a pretrial physical lineup and in court." Defendant claimed the lineup was unduly suggestive and therefore all identifications based thereon had to be excluded, including "any in-court identifications." After the hearing, in which the court heard from the

witnesses and watched the video of the lineup, the court denied the motion, ruling the lineup was not "impermissibly suggestive."

After being held to answer, defendant renewed his motion to exclude all identifications as stemming from "unduly suggestive procedures." The first of these, according to defendant, was putting his DMV photo in the photo lineup "[w]ithout ever providing a description of [defendant] or mentioning him." The second was he was the only participant that appeared in both the photographic and the in-person lineups. The third was using fillers in the physical lineup who assertedly did not "match the description provided by the witnesses."

The court again ruled the lineup was not suggestive.

The test to determine whether a defendant's right to due process is violated by the admission of identification evidence is two-fold. "[W]e consider ' "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 556–557; *People v. Wilson* (2021) 11 Cal.5th 259, 283 (*Wilson*).)

To be unduly suggestive, the challenged "procedure must ' "give rise to a very substantial likelihood of irreparable misidentification." ' [Citations.] It is not enough that the procedure 'may have in some respects fallen short of ideal.' " (*Sexton v. Beaudreaux* (2018) 585 U.S. 961, 965–966; *Wilson, supra*, 11 Cal.5th at p. 283.) In evaluating the suggestiveness of a lineup, "we consider 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' " (*Wilson,* at p. 284.) If " 'we find that a challenged procedure is not impermissibly

suggestive, our inquiry into the due process claim ends.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (*Ochoa*).)

Even "[i]f we determine the procedure was suggestive, no due process violation arises if ' " 'the identification itself was nevertheless reliable under the totality of the circumstances.' " ' [Citations.] In assessing the totality of the circumstances, we consider ' "such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." [Citations.] "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." ' " (*Wilson, supra*, 11 Cal.5th at p. 283.)[5]

### *Suggestiveness*

Despite the well-established framework for resolving complaints about lineup identifications, defendant made no argument in his opening brief that the lineup procedures were impermissibly suggestive. Rather, he focused

_____

[5] "A defendant's claim that an identification procedure was unduly suggestive is a 'mixed question of law and fact.' [Citations.] This standard applies because 'the facts are established, the law is undisputed, and the issue' we must resolve 'is whether the law as applied to the established facts is violated.' [Citation.] We review the so-called 'historical facts,' those factual determinations that underpinned the trial court's conclusion that the identification was or was not suggestive, 'under a deferential standard.' [Citation.] This standard acknowledges that the trial court may have made 'credibility determinations,' that 'contribute[d] to deciding the facts of what had already happened, [but] were not dispositive of the inquiry because the trial court did not have a "first-person vantage" ' to whatever 'facts occurred outside of court.' " (*Wilson, supra*, 11 Cal.5th at p. 283.)

*solely* on whether the totality of the circumstances nevertheless made the identifications reliable—the second part of the analysis, which comes into play only if it is first determined the lineup is unduly suggestive. In short, as the Attorney General points out, defendant failed to establish the essential predicate for a viable challenge to a lineup identification. (See *Ochoa, supra,* 19 Cal.4th at p. 413 ["for a witness identification procedure to violate the due process clause, the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure"].)

Not until his closing brief does defendant address the issue of suggestiveness. However, "[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party" and are waived. (*People v. Tully* (2012) 54 Cal.4th 952, 1075; see also *Mateel Environmental Justice Foundation v. Office of Environmental Health Hazard Assessment* (2018) 24 Cal.App.5th 220, 241 ["Although, for good cause, we occasionally may exercise our discretion to consider issues first raised in a reply brief [citation], '[m]ore often, however, issues not properly addressed in the opening brief will be disregarded on appeal.' "].)

Even if we were to overlook defendant's waiver, there is another threshold difficulty with his belated argument that the in-person lineup was unduly suggestive. Although defendant mentions the video of the lineup, it is not included in the record on appeal, and in his reply brief, defendant cites to still photographs made from frames of the video and which he attached to his motion to exclude. These photographs are far from clear, and while they show some physical attributes of the participants—such as height—they do not show or allow comparison of most of the detailed attributes about which defendant complains. In short, defendant has not provided a record that

allows us to assess the merits of his claim that the lineup was unduly suggestive. (See *People v. Garcia* (2018) 29 Cal.App.5th 864, 871 [it is appellant's burden to provide a record allowing review and demonstrating error].)

In any case, given the record defendant has provided, he has not demonstrated that the "physical buildup and appearances of the fillers were so distinctively different from [him], as to make [him] stand out" as he claims in his closing brief. All of the participants were wearing the same jail clothing with a black baseball cap facing forward. Except for one filler, the participants were all of a similar age, between 23 and 27 years old. Three were "husky" and three were "thin." They were all White and ranged in height from 5'5" to 6'0". Three of the participants, including defendant, were six feet tall. Even assuming, as defendant claims, two fillers had visible tattoos—which we cannot see from the photos—that would not have made defendant stand out. Witnesses described the shooter as wearing long sleeves, so they could not have seen whether there were tattoos on the shooter's arms, as defendant claims with respect to one of the tattooed fillers. All of the participants, including defendant, had dark brown hair and "variations of facial hair." Three had long hair and three had short hair. Indeed, the only feature defendant claims was not shared by at least one other participant and was unique to him, is his "pointy" nose. However, the still photographs on which defendant relies do not clearly show this to be the case. In fact, based on our own review of the photographs, it appears at least two other participants also have a pointy nose.

In sum, while the participants were not identical to defendant, nothing about them made defendant "stand out." (See *Wilson, supra*, 11 Cal.5th at pp. 284–285 [lineup not suggestive because although "[a]ll of the men in

14

defendant's six-pack were distinct in some respect from one another, with varying hairstyles and clothing," nothing " 'in the lineup suggested that the witness should not select defendant' "].)

Given that the lineup was not unduly suggestive, we need not address the second prong of the analysis—reliability. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1256 (*Virgil*) ["because we find that the challenged procedure was not unduly suggestive, our inquiry into the due process claim ends"]; *People v. Cook* (2007) 40 Cal.4th 1334, 1355 [having failed to show the various identification procedures were unduly suggestive, we need not address any argument the identifications were nonetheless reliable under the totality of the circumstances].) However, defendant's challenge also fails under that prong, as well.

### *Reliability*

"In assessing the totality of the circumstances, we consider ' "such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." [Citations.] "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." ' " (*Wilson, supra*, 11 Cal.5th at p. 283.)

Defendant asserts the witnesses did not have a good opportunity to view the shooter, pointing to T.J., T.L., and S.H.'s testimony they only saw the shooter "for a very short time, 'it happened kind of fast,' 'maybe about almost 60 seconds,' 'a couple of seconds,' 'quick second viewing his face.' " He also points to T.J.'s testimony to police that she " 'did not see his face at all,' " T.L.'s testimony she "barely" saw the shooter's face, and S.H.'s testimony that

15

she " 'didn't really get a glimpse of the face.' "  However, while the young women may have only briefly viewed the shooter's face, they all did so at very close range and while it was still light outside.  T.L. testified the shooter was "about three, four feet away."  S.H. said, "[w]hen he was approaching" the shooter was "very close."  He was "like a few feet away," "We could touch each other.  It was pretty close."  Moreover, they all heard the shooter's voice and were able to compare the voices of the lineup participants, each of whom repeated what the witnesses had heard the shooter say.

Defendant next points out T.J. "was too busy paying attention to what [the shooter] was reaching for" and afterwards told police, " 'the incident happened so fast that I don't think I could identify the male.' "  Similarly, T.L. stated after "barely" seeing the shooter's face, her attention turned to the firearm.  And after S.H. saw the shooter, she turned and ran, was scared, and her attention was on the shooter's pocket.  Indeed, all three witnesses said they ran after hearing the gunshots.  However, they ran only a very short distance, they remained at the scene, and they were able to provide descriptions of the shooter to the 911 operator and later to the police.  Further, T.L. later confirmed she did, in fact, see the shooter's face.  And after the lineup, she told police, "Everything physical about No. 3 looks like what I described."

Defendant further contends "discrepancies in the accuracy of all the witnesses' descriptions" weigh "in favor of finding the identification procedure unreliable."  He points to T.J.'s police interrogation where she identified the shooter as Mexican, stated she only saw the side of the shooter's face and that he had curly hair, and identified Felipe as the shooter; T.L.'s statement to the police that the shooter was Hispanic and testimony at the preliminary hearing that she "hardly" saw the shooter's face and did not notice anything

16

distinctive about the shooter's face; and S.H.'s statement to the 911 operator that she was not necessarily able to see the shooter and her later description to police that the shooter was "Latino" and five feet seven inches tall, "whereas the appellant is over 6 feet tall."

However, as we have recited, all the witnesses described the shooter as having fair skin, as White and maybe Hispanic, and as being fairly tall or taller than Felipe. They also all described him as having a pointy nose and as having hair reaching or touching his ears. These consistencies in the witnesses' observations are sufficient to meet the reliability prong. (See *People v. Romero* (2008) 44 Cal.4th 386, 400 [witnesses' identification reliable where both described suspect as having a ponytail].) Thus, any inconsistencies in the witness's descriptions were "matters affecting the weight of [the] witnesses' testimony, not its admissibility" and were properly left to the jury. (*Virgil, supra*, 51 Cal.4th at p. 1256.)

Defendant next points out neither T.L. nor S.H. identified defendant in the photo lineup, T.J. and T.L. placed question marks next to defendant's number at the in-person lineup, and although S.H. put an "X" next to defendant's number in the lineup, she also put a "?" next to participant No. 1. However, the witnesses' lack of absolute certainty did not render their identifications unreliable, requiring exclusion of the evidence.

The officer admonitions immediately prior to the witnesses viewing the lineup—that the shooter might not be present in the lineup and they need not identify anyone—and the witnesses' confirmation that they understood these admonitions, also support the reliability of the identifications. (*People v. Cunningham* (2001) 25 Cal.4th 926, 990 [no " 'substantial likelihood of irreparable misidentification' " during photographic lineup where the witness " 'was instructed that he was not to assume the person who committed the

crime was pictured therein, that it was equally important to exonerate the innocent, and that he had no obligation to identify anyone' "].)

Defendant also had ample opportunity to, and did, cross-examine the witnesses about their identifications. This significantly reduced the possibility of any " 'irreparable misidentification.' " (*Manson v. Brathwaite* (1977) 432 U.S. 98, 116; see *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 770 [identification was reliable where "[t]he defense was able to thoroughly cross-examine [the witness] and delve into factors bearing on reliability of his identifications"]; *People v. Alexander* (2010) 49 Cal.4th 846, 903 [no due process violation where the "circumstances of the identification were disclosed to the defense, they were the subject of thorough cross-examination, and the jury was able to evaluate the reliability [of the witness's identification]"].)

Defendant lastly complains that the witnesses' limited views of the shooter's face and the fact four months passed between the crime and in-person lineup, rendered the identifications unreliable, citing to *Martin v. Indiana* (1977) 438 F.Supp. 234, 237. In *Martin*, the court held the passage of approximately four months between the crime and the confrontation was a "substantial amount of time," and, coupled with the "short observation at the scene of the crime," the "likelihood of misidentification becomes less a possibility and more a probability." (*Martin, supra*, at p. 237.) However, numerous other courts have held such time periods are not so substantial as to make an identification unreliable. (*United States v. Rivera-Rivera* (2009) 555 F.3d 277, 284–285 ["six-month span here is de minimis"]; *United States v. Henderson* (2003) 320 F.3d 92 [two and one-half years gap between in-court identification and crime permissible "given strength of the other factors"]; *United States v. Flores-Rivera* (1995) 56 F.3d 319, 331 [seven-year gap

between crime and identification permissible where "other reliability criteria were sufficiently persuasive"].)  All of these cases ultimately turn on their unique constellation of facts.  The totality of the record here simply does not support a conclusion that the witnesses' identifications were unreliable.

Finally, even overlooking the waiver and record issues, and even assuming the physical lineup was unduly suggestive and under the totality of circumstances the identification was unreliable, any error was harmless. (*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*); *People v. Chavez* (2018) 22 Cal.App.5th 663, 675 ["If a defendant's federal constitutional right to due process is violated" because an identification procedure was unduly suggestive, "reversal of the defendant's conviction is required unless the People show that error was harmless beyond a reasonable doubt."].) Defendant matched descriptions given by the witnesses to 911 operators and the police *before* the lineups, i.e., a White or Latino male with fair or light-colored skin, dark longish hair, a pointy nose, and tall or taller than Felipe. Felipe's testimony also placed defendant at the scene at the time of the murder and confirmed there was a shooting.  The murder weapon, a .45-caliber Glock handgun, was the same type of gun registered in defendant's name.  The registered gun matched Felipe's description of the gun he knew defendant possessed.  Expert testimony established that DNA evidence indicated it a "very strong" and "extremely" strong likelihood defendant was a contributor to the DNA on the bullets found at the scene of the crime.  Cell phone data also placed defendant in the area at the time.  In short, the evidence supporting defendant's convictions was overwhelming.  (See *People v. Sandoval* (1977) 70 Cal.App.3d 73, 86 [error in admitting "tainted identification" harmless in light of "ample untainted, highly probative evidence linking defendant to the [crimes]"].)

***Witness Impeachment***

During motions in limine, the prosecutor moved to introduce evidence of defendant's "arrest and possession of firearms with silencers and extended magazines, as well as a violation of court ordered bail terms, as impeachment evidence." During a search of defendant's cabin, which was located outside the area set forth in defendant's bail terms, officers found a .40-caliber Glock 27 firearm and a 9mm Glock 17 firearm, both of which were loaded with chambered rounds. Additionally, the Glock 17 "had an illegal 'SilencerCo' silencer attached to it," and officers located "multiple extended magazines in a backpack next to the bed." The prosecution anticipated defendant would "mount a defense of mistaken identity and third-party culpability," and as such sought admission of the evidence for impeachment because it involves "moral turpitude [and] suggests a willingness to lie." Defense counsel objected that the evidence was highly prejudicial, irrelevant to the issues in the case, and it was being introduced "merely to smear my client's character."

The court granted the motion "for impeachment purposes only, but there's going to have to be a reason for this impeachment. I think that it is probative, more so than prejudicial, the fact that he is found in a home with some weapons. [¶] So . . . if your client testifies, I will allow it in as impeachment evidence, but I also need to hear the nature of his testimony first. Okay? So I am granting it now, but we can review this request at a more appropriate time."

The prosecutor also sought to exclude evidence of Felipe's prior bad acts and criminal history and specifically his arrest while the murder investigation was underway, where he was found to have "a .380 caliber revolver in his waistband." Felipe told the police he "started carrying" the gun because he and a friend were being blamed for the murder, and Felipe

"was afraid for his safety," especially since his friend and the friend's mother had "actually been shot" already in retaliation. The prosecutor argued, under Evidence Code section 352, "the fact that [Felipe] possessed a .380 revolver is substantially more prejudicial than probative. It's not a conviction. It's a pending case. I concede that he can probably [be] impeach[ed by] the existence of that charged case and things like that, but in terms of being specifically impeached with possessing a firearm, it's far too prejudicial, it's irrelevant, and I would ask the court to exclude that." The prosecutor also sought to exclude the evidence as impermissible character evidence under Evidence Code section 1101, subdivision (a),[6] designed to show the jury that "Felipe has a propensity to carry firearms," and considering the weapon he was arrested with was not the type of weapon used in the shooting meant it was not probative of any third party culpability defense.

Defense counsel argued, "With regard to the pending possession of a firearm case, you know, Judge, I just don't think we can have it both ways, right? If you think my client's possession of a firearm in 2020 is probative and relevant to impeaching him if he testifies, why wouldn't it be probative to impeaching Mr. Jacob Felipe in this situation? He admits to possessing it.

_____

[6] Evidence Code section 1101, subdivision (a) provides: "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . . ) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." (Evid. Code, § 1101.)

21

It's not an issue. And so I think it's totally relevant and it's—for purposes of impeachment and it would be really quick."

The prosecutor responded, "I understood the court's ruling with respect to [defendant's] post-murder arrest for the firearms and the silencer. You had said I could impeach him dependent upon what he says. It's not just coming in if he testifies. And so I would ask, if the court is inclined to allow impeachment with Mr. Felipe the same, to fashion the ruling that same way."

The court excluded the details of Felipe's arrest, and specifically his possession of the .380-caliber firearm, stating the gun evidence as to defendant and the gun evidence as to Felipe presented different issues. "Possession of a .380 caliber revolver and possession of a or owning a Glock, and the murder weapon is a Glock, that's different, because there's no allegation that this person was killed or shot with a .380. It's a totally different weapon. [¶] And I think if that is presented to the jury, then that goes to propensity, I think. I think it goes to character. And I don't think that that is—I think that's more prejudicial than probative. And I think that you can distinguish those two, the possession of and ownership of the Glock as opposed to that .380. Those are two different things. I don't think you can lump those up together and say, 'Well, if we're going to do it for this incident—we're going to enter Mr. Watson's connection with the gun in this incident and we're not for the .380.' Those are just different." Thus, while the fact Felipe had a "pending case is relevant, . . . the details of it are not."

Defense counsel then maintained he would not use Felipe's possession of the firearm as propensity evidence, but "exclusively for the purposes of impeachment as a conduct of moral turpitude." The court again declined to allow details of the arrest, stating "I hear where you're going, but I do think that—that might be your direction, but I think that there's a danger that it

22

would be taken as propensity, and I think that that would be highly prejudicial and not—and that outweighs the probative nature, because it's a .380. It's not a Glock. If he had a Glock on him, then we're talking, but he didn't."

" 'A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Foss* (2007) 155 Cal.App.4th 113, 125.)

Defendant maintains "the court arbitrarily evaluated the prejudicial effect of the moral turpitude of firearm possession in a contradictory way" in that it ruled "the facts of Felipe's firearm possession were unduly prejudicial even when used only for impeachment purposes" but "the facts of [defendant's] alleged 2020 possession of firearms w[ere] not unfairly prejudicial."

The trial court's evaluation was not "contradictory." As the trial court observed, the murder weapon was a Glock firearm and defendant was found with several Glock firearms. Felipe, however, possessed a different kind of weapon. Accordingly, the firearm Felipe possessed had no connection with the instant case. There was "no allegation that [Ignacio] was killed or shot with a .380. It's a totally different weapon." Accordingly, the court did not unreasonably conclude that the fact Felipe was arrested with a different type of firearm was "highly prejudicial" and "more prejudicial than probative."

*People v. Davis* (1995) 10 Cal.4th 463 (*Davis*), cited by the Attorney General, supports the trial court's exclusion of the details of Felipe's arrest. In *Davis,* the defendant sought to introduce "evidence of other crimes" by a third party to corroborate his defense that the third-party committed the

23

charged murder. (*Id.* at p. 500.) The trial court ruled the evidence "did not exhibit sufficient similarities to the events related by defendant to establish [the third party's] motive, intent, or identity. Instead, it found that the evidence of prior acts constituted character evidence, showing [the third party's] propensity to engage in the kind of activity alleged to have resulted" in the murder. (*Ibid.*) The Supreme Court affirmed, stating "evidence of third party culpability must be capable of raising a reasonable doubt of the defendant's guilt; 'there must be direct circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*Id.* at p. 501.) The proffered evidence was properly excluded because it "did not relate to motive and intent but was essentially an attempt to show that [the third party] was more likely to have been the killer because he had a history of violence. Moreover, there was *no* evidence supporting defendant's testimony that [the victim] knew [the third party] or that the [third party] was present when [the victim] was assaulted." (*Ibid.*)

Here, Felipe knew Ignacio, and Felipe was in the immediate area when Ignacio was killed. However, the fact Felipe was later arrested with a .380-caliber weapon did not provide "direct or circumstantial evidence linking" him to the " 'actual perpetration of the crime,' " since the murder was committed with a Glock. (*Davis, supra,* 10 Cal.4th at p. 501.) Thus, the evidence Felipe was in possession of a .380 was useful only as to propensity, and the trial court did not abuse its discretion in excluding it. (See *ibid.*)

### Cross-Examination

During defendant's cross-examination of Felipe, the following exchange occurred:

"[Defense counsel]: Mr. Felipe, did you carry a gun back in September of 2016?

"[Prosecutor]: I'm going to object.

"THE COURT: All right. On that—the day in question that we're talking about, were you armed with a firearm?

"[Felipe]: No.

"[Defense Counsel]: Okay. On that day that we're talking about, September 22, 2016, did you keep a firearm in the apartment?

"[Prosecutor]: Objection. Relevance.

"THE COURT: Sustained.

"[Defense Counsel]: Can we approach, your Honor?

"THE COURT: No.

"[Defense counsel]: On September 22nd, 2016, Mr. Felipe, did you keep a firearm near the side gate in the back of your apartment?

"[Felipe]: No.

"[Prosecutor]: Objection. Relevance. Move to strike.

"THE COURT: Overruled. The answer remains.

"[Defense counsel]: So it's your testimony today that you had no access to a firearm on September 22nd, 2016?

"[Prosecutor]: Objection. Misstates the witness's testimony.

"THE COURT: Sustained."

Defendant contends the "trial court erred by preventing the defense from properly cross-examining Felipe about his access to a firearm." He contends Felipe's answer to whether he had a gun in his apartment was relevant as it "would clearly 'have a tendency to prove or disprove any disputed fact that is of consequence' to appellant's guilt or innocence"—that it was Felipe, not defendant, who killed Ignacio.

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) However, Evidence Code section 352 provides, "The court in its

25

discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We review the trial court's decision to admit or exclude evidence for abuse of discretion." (*People v. Dworak* (2021) 11 Cal.5th 881, 895 (*Dworak*).)[7]

The trial court did not expound on its reasoning for sustaining the objection. Nor did defendant request that the court to do so or request an opportunity to place his position on the record. We must therefore assume the trial court understood the applicable evidentiary principles and made all findings necessary to support its ruling. (See *People v. Coddington* (2000) 23 Cal.4th 529, 644 [we presume "the court knows and applies the correct statutory and case law [citation] and is able to distinguish admissible from inadmissible evidence, relevant from irrelevant fact, and to recognize those facts which properly may be considered in the judicial decisionmaking process"], overruled on another ground in *Price v. Superior Court* (2001)

---

[7] There is no "special rule governing evidence of third party culpability." " '[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([*id.*,] § 352).' [Citation.] In making this assessment, courts should be mindful that third party evidence 'need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' [Citation.] [*People v. Hall* (1986) 41 Cal.3d 826, 833] explained that, in general, 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*Dworak, supra,* 11 Cal.5th at p. 895.)

25 Cal.4th 1046, 1069, fn. 13; Evid Code, § 664 ["It is presumed that official duty has been regularly performed."].)

We therefore presume the trial court's sustaining of the prosecutor's objection was consistent with its earlier evidentiary ruling, which we have upheld, excluding details of Felipe's subsequent arrest and, specifically, that Felipe was in possession of a firearm. Although the court did not expressly engage in an Evidence Code section 352 analysis in sustaining the objection, we must infer that it did so. (*People v. Prince* (2007) 40 Cal.4th 1179, 1237 [trial court need not expressly weigh section 352 factors on the record if that weighing can be inferred from the record].) Defendant makes no argument to the contrary, and concedes "on its own . . . the trial court's state evidentiary errors do not meet" *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) standard of prejudice.[8]

## Firearm Enhancement

While ensuring defendant understood the repercussions of going to trial and rejecting any plea deal, the trial court observed it had discretion to strike the Penal Code section 12022.53[9] enhancement but that it might not do so. The court stated, "[Y]ou do realize if you are convicted of that second, that my hands are pretty much tied. You'd be doing that 40." Defense counsel responded, "Your Honor, I just want to clarify for the record that, in fact, the 25-to-life enhancement is actually discretionary now." The court replied, "That is true. So I do have discretion. Thank you. I do have discretion. I could exercise my discretion. I couldn't. If I don't, that means you're doing

---

[8] Given our conclusion there was no evidentiary error, we need not and do not address defendant's claim of cumulative error.

[9] All further statutory references are to the Penal Code unless otherwise indicated.

the max.  If I do, that means you could do less.  All right?  [¶]  But you're willing to, say, gamble and go to trial?"  Defendant stated, "Your Honor, if the Court is worried about me, yes, your Honor" and later, "Yes.  You can put it on the record I understand, your Honor."

In the probation report, defendant, while speaking with the probation officer, described his childhood as not " 'terrible or anything like that,' " and he "denied encountering any mental, physical, or sexual abuse as a child or teenager."  He stated his mother "may have had 'Substance abuse' issues prior to his birth," and he "had been diagnosed with 'Bipolar, Asperger's, and ADHD.' "  He reported having previously taken medication "to address his mental health in elementary and middle schools," but that he "did not take medications in high school."  Defendant was 24 years old at the time of the murder.

The probation report stated defendant was statutorily ineligible for probation and listed three factors in aggravation and one in mitigation.[10]  The mitigating factor was that defendant had no prior criminal record.

The prosecution urged the court to decline to exercise its discretion to dismiss the firearm enhancement and to sentence defendant to 40 years to life.

Defendant asked the court to exercise its discretion, under newly enacted legislation (Sen. Bill No. 620),[11] "not [to] impose any additional

---

[10] The factors in aggravation included: (1) the "crime involved great bodily harm and callousness which resulted in death"; (2) the "victim was unarmed"; and (3) defendant "has engaged in violent conduct which indicates a serious danger to society."  (Cal. Rules of Court, rule 4.421(a) & (b).)

[11] Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill No. 620) (Stats. 2017, ch. 682, §§ 1, 2, eff. Jan. 1, 2018).

prison sentence for the gun enhancement." Counsel urged the court to consider defendant's age at the time of the offense (24 years old), that he had no prior criminal record, and his "very challenging upbringing and mental and psychiatric history." This included that defendant was "raised in an unstable and broken home," as his parents divorced "at a young age, causing his mother to raise him essentially alone." Additionally, his mother's frequent moves caused "resentment by [defendant] as he did not have a pleasant experience moving . . . and being away from his father." Defendant's father, in turn, subjected defendant "to severe beatings and physical violence," and the "combination of violence and an unstable family household had a tremendous impact on [defendant's] ability to make proper decisions throughout his life." Counsel also pointed out defendant "suffered from learning disabilities, psychological disorders and failed attempts at providing him the necessary tools to handle his circumstances." Defendant "was regularly diagnosed and treated for a mood disorder, Asperger's disorder, and attention deficit hyperactivity disorder," and he had been "prescribed Risperdal, a drug often prescribed to help treat schizophrenia, bipolar disorder, and irritability caused by autism." Counsel urged that, "considering all of these mental health issues, the crime before the court is a reflection of a hyper-sensitive overreaction from mental health concerns rather than from a sophisticated hardened criminal."[12]

At the outset of the sentencing hearing, defense counsel asked the court for leave to withdraw the sentencing memorandum stating, "I wanted to bring to the court's attention this morning that Mr. Watson wanted to express to the court his desire to have me withdraw my arguments in

_____

[12] Defendant attached to his sentencing memorandum a mitigation report, several education plans, and medical conclusions and findings.

mitigation as well as any arguments I made to this court to exercise its discretion and not impose the gun enhancement in this case. . . . Mr. Watson wants to express to the court, by making that request, his insistence that he's innocent in this case. So he is in disagreement with any arguments in mitigation that I've submitted in my sentencing memorandum . . . ." The court denied the request to withdraw.

The prosecutor urged the court to decline striking or dismissing the firearm enhancement, arguing the nature of defendant's actions indicated defendant "poses an extreme risk to the community." He characterized defendant's asserted mitigation factors as "boil[ing] down" to "his parents got divorced and he was disciplined too much," which was "not an excuse or mitigation." The defense submitted on the sentencing memorandum.

After hearing from the victim's family, the court sentenced defendant to a term of 40 years to life. The court stated, "I don't find any factors in mitigation, any. . . . Not the upbringing, none of that. I know a number of people that had IEPs, that were from divorced households. They don't go around carrying guns, shooting people. [¶] And then when he's arrested, after he's accused of murder, he's found in a house with an arsenal, with a silencer, with magazines loaded with bullets. That's a person, to me, that is a serious danger to society. He has already exhibited violent conduct. This event included great violence, great bodily harm, a high degree of cruelty, viciousness and callousness. He was armed with a weapon the victim was not.

"[¶] . . . [¶] This is one of those upsetting trials for me, and I see them all. But when a life is lost because someone is a poser or a wannabe and wants to be something else to be accepted or to be seen as tough and they hurt somebody, those really get to me, because he was not about that life. No

30

one should be about that life.  But he wanted to show people that he was tough, and that's why he's here.  And the fact that he's shown no remorse throughout this trial indicates to me more so that he's a serious danger to society.  [¶]  He knew exactly what he was doing.  During the lineup changing his voice, cutting his hair, presenting as if he's a choir boy in this church—in this courtroom.  But the evidence showed something different. . . .

"So, he is statutorily ineligible for probation.  Probation is denied.  He will be sentenced as follows:  [¶] First, just to make it clear, I find all the circumstances in aggravation that are listed in the DA's report to be true. The only factor in mitigation is no prior criminal record, but he has displayed some serious, concerning conduct.  [¶] . . . [¶] For count 1, the 187, the indeterminate term of 15 years to life.  I am not going to exercise my discretion in this case for all the reasons listed by [the prosecution's] sentencing memorandum, for what happened here today, the fact that there are factors in aggravation more so than mitigation."

The court then sentenced defendant to a consecutive 25-years-to-life term for the section 12022.53 enhancement, declining to exercise its discretion under section 1385 or section 12022.53, subdivision (h).  The court also imposed but stayed sentences for the remaining three enhancements pursuant to section 654.

"Before 2018, sections 12022.5 and 12022.53 prohibited a trial court from striking a firearm enhancement required to be imposed under those sections.  [Citation.]  The Legislature enacted Senate Bill No. 620 . . . to amend sections 12022.5 and 12022.53, effective January 2018, to give the trial court discretion to strike those enhancements:  Sections 12022.5, subdivision (c) and 12022.53, subdivision (h), now provide that a court 'may, in the interest of justice pursuant to Section 1385 and at the time of

31

sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.' [Citations.]

"In 2021, the Legislature enacted Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill No. 81), which amended section 1385 to specify mitigating circumstances that the trial court should consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–16 (*Lipscomb*).) In particular, section 1385, subdivision (c) now provides:

"(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any mitigating circumstance in subparagraphs (A) to (I) are present. Proof of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious dangers to others."[13] (§ 1385, subd. (c)(1)–(2).)

---

[13] The mitigating circumstances include: application of the enhancement would result in a discriminatory racial impact; multiple enhancements are alleged in a single case; application of an enhancement could result in a sentence of over 20 years; current offense is connected to mental illness or to prior victimization or childhood trauma; current offense is not a violent felony; defendant was a juvenile when the offense was committed; enhancement is based on a prior conviction, which is over five years old; and an inoperable or unloaded firearm was used in the commission of the crime. (§ 1385, subd. (c)(2)(A)–(I).)

Citing *Lipscomb, supra*, 87 Cal.App.5th 9, defendant complains the "trial court did not explicitly find [he] would endanger public safety." Defendant's reliance on *Lipscomb* is misplaced. While the trial court in that case did, indeed, make "an explicit finding that dismissing the enhancement 'would endanger public safety,' " the Court of Appeal did not hold an explicit finding is required to support imposition of the enhancement. Rather, the appellate court pointed to the finding as evidencing the trial court understood the scope of its discretion under the recent amendments. (*Id.* at p. 18.) The Court of Appeal went on to hold, contrary to the defendant's argument in that case, that the trial court "was not required to 'consider and afford great weight' to evidence that application of the enhancement could produce a sentence of over 20 years." (*Ibid.*) In short, the appellate court did not rule that a trial court must employ any particular language—explicit or otherwise—before declining to strike a firearm enhancement.

Section 1385 contains no requirement that the trial court articulate any findings or rulings in dismissing or refusing to dismiss an enhancement. (§ 1385, subd. (c); see *In re Large* (2007) 41 Cal.4th 538, 550 [noting the express findings requirement of section 1385, former subdivision (a) only if a strike is dismissed].) Moreover, the record demonstrates the trial court was aware of the scope of its discretion under section 1385, subdivision (c)(1) and (2), as defendant's sentencing memorandum addressed the issue. Indeed, the trial court also stated during the sentencing hearing that defendant was a "serious danger to society" and it was declining to exercise its discretion under section 1385.

Defendant further argues any finding "that dismissal of the enhancement would endanger public safety" is unsupported because "there is no realistic likelihood that dismissing the 25-years-to-life enhancement would

33

result in another person suffering physical injury or being placed in serious danger." That is because, says defendant, "even if the enhancement is dismissed, appellant would still be serving a life sentence on the underlying murder conviction." Further, since defendant could not be released on parole if the board finds he presents a public safety concern, "adding 25 years on top of an already indeterminate sentence served no purpose in protecting the public."

Defendant cites no authority for the proposition that a trial court abuses its discretion by imposing a sentence enhancement where the defendant is sentenced to an indeterminate life term. Nor are we aware of any such authority. To the contrary, as the Supreme Court explained in *People v. Shabazz* (2006) 38 Cal.4th 55, 70, "Although defendant contends it would be unreasonable to assume that the Legislature intended that the section 12022.53 enhancements would be imposed on a defendant who is sentenced to life imprisonment without the possibility of parole, because the enhancement would have no practical effect, the words employed in section 12022.53 defeat defendant's argument: the statute states specifically that it is intended to apply to 'any felony punishable by death or imprisonment . . . for life.' (§ 12022.53, subd. (a)(17))." (*Shabazz*, at p. 70 [reversing Court of Appeal judgment vacating 25-years-to-life enhancement under § 12022.53, subd. (d), on the defendant's LWOP sentence]; see also *People v. Chiu* (2003) 113 Cal.App.4th 1260, 1262 [the defendant properly sentenced to § 12022.53, subd. (d) firearm enhancement on consecutive LWOP sentence].)

In sum, the trial court did not abuse its discretion in declining to dismiss the firearm enhancement.

### *Presence at Sentencing Hearing*

At the start of trial, defendant, who was in custody, was admonished by the trial court after he was twice observed communicating with his family members—despite a courtroom sign prohibiting such communication and despite a deputy telling him to stop doing so. The prosecutor also reported there had been some "pushback" from defendant when the deputy told him to stop talking to his family.

Specifically, the court stated, "All right. So, Mr. Watson, there's no communication. There's no turning around. There's no waving. Okay? [¶] . . . [¶] . . . If my deputy tells you to do something, then you do it. If I hear that you're giving lip, we're going to have a problem. I want you here because this is your trial, but there's rules that have to be followed. Okay? If you can't follow those rules, then I'll exclude you from the proceedings. I don't want to do that. All right? If she tells you to do something, that's what you do. Okay?" Defendant responded, "Yes."

At the sentencing hearing, after hearing from the victim's family members and defense counsel, defendant gave a statement. During his statement, defendant used a curse word, and the court admonished him to "Watch your mouth." Despite defendant's immediate apology, he subsequently cursed again. However, the court gave no admonishment, and defendant finished his statement. The court then heard from the prosecutor.

After the statements, the court began to pronounce sentence, with interruptions by defendant:

"THE COURT: Okay. All right. Well, let me start off by saying this: This is tragic on so many levels. I sat here and I saw the witnesses testify and how this event has affected them. I saw the family throughout the whole trial and there was not a dry eye in this courtroom. I feel for the victim in

35

this case.  This didn't have to go down like this.  [¶] I grew up in LA, in Oakland, and I had a lot of friends that were in gangs or sold drugs or, you know, just got into trouble, but one thing folks did is they stayed in their lane of traffic.  This wasn't your beef.  You had nothing to do with this.  And don't sit in here and say you are innocent.  Don't give me that.

"[Defendant]:  That's exactly what—that's what—

"THE COURT:  See, and that's your problem, because you pinged—you pinged all the way from start to finish where this happened, your phone. You're trying to blame this on another person who didn't want that smoke. He didn't want those issues.  [¶] You are a wannabe.  That's what happens. People that want to belong, they end up doing stuff and going too far.  This wasn't your fight.  It was a fight, not a gun battle.  You chased down a 19-year-old and shot him in the back.  You can say that all you want, but I know the truth.  The evidence and the jury saw it.

"[Defendant]:  The evidence you let them see.

"THE COURT:  Shut your mouth.

"[Defendant]:  Oh, what about the other evidence?

"THE COURT:  Shut your mouth.

"[Defendant]:  You're restricting me in court.

"THE COURT:  Take him out."

Defendant was then removed from the courtroom.

Defendant claims the trial court prejudicially violated his constitutional and statutory rights to be present throughout his sentencing hearing.

"A defendant has the constitutional right to be personally present in court 'where necessary to protect the defendant's opportunity for effective cross-examination, or to allow him to participate at a critical stage and

36

enhance the fairness of the proceeding.' " (*People v. Flinner* (2020) 10 Cal.5th 686, 710.) "The right is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution as well as article I, section 15 of the California Constitution." (*People v. Basler* (2022) 80 Cal.App.5th 46, 57.) "Critical stages of a defendant's criminal prosecution include the imposition of sentence . . . ." (*Ibid.*; § 977, subd. (b)(1) ["in all cases in which a felony is charged, the accused shall be physically present . . . at the time of the imposition of sentence"].)

However, the right to be present is not absolute. " '[A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.' " (*People v. Bell* (2019) 7 Cal.5th 70, 117; § 1043, subd. (b)(1) [same].)

Defendant maintains that, in violation of section 1043, subdivision (b)(1), he "was not warned that he would be removed for bad behavior prior to his removal." And while he concedes he "engaged in a contentious exchange with the court," he asserts his "conduct" was not so extreme, aggravated or prolonged as to warrant "his removal contrary to statute and without warning."

" 'On appeal, we apply the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from pretrial and trial proceedings, either in whole or in part, "insofar as the trial court's decision entails a measurement of the facts against the law." ' " (*Virgil, supra*, 51 Cal.4th at p. 1235; *People v. Waidla* (2000) 22 Cal.4th 690, 741.)

37

The Attorney General, pointing to the trial court's warning at the beginning of trial when defendant persisted in attempting to communicate with his family, argues defendant was sufficiently warned about the possibility of removal if he continued being disruptive. He further argues that, even if the court should have given a second warning, the error was harmless under the circumstances. We agree any error was harmless and therefore do not address whether a second warning should have been given.

Error in excluding a defendant represented by counsel is assessed using the harmless error analysis under both state law (*Watson, supra*, 46 Cal.2d at p. 836) and federal law (*Chapman, supra*, 386 U.S. at p. 24). (*People v. Mendoza* (2016) 62 Cal.4th 856, 902; *People v. Whitmore* (2022) 80 Cal.App.5th 116, 127.) Any error in excluding defendant, here, from the remainder of the sentencing hearing was harmless under either standard.

Defendant posits that the trial court's supposed abuse of discretion in imposing the firearm enhancement, without "properly evaluating the reforms enacted" by Senate Bill No. 81, "may well have occurred because of a momentary lapse in judgment caused by the contentious nature of the trial court's confrontation with appellant and his subsequent removal." However, as we have explained, the trial court did not abuse its discretion in imposing the enhancement. Moreover, defendant's argument is wholesale speculation. The record does not remotely support a conclusion that defendant's interruptions caused the court a "momentary lapse in judgment," let alone one that resulted in the court's mistakenly imposing a firearm enhancement it had intended not to impose.

Despite defendant's request that his counsel withdraw his sentencing statement and that the court not consider any mitigating factors, the court denied the request, considered the sentencing memorandum, heard from the

prosecutor, and heard from victim's family members.  Defendant was present during all of this and was not removed from the courtroom until the final minutes of the hearing.  In sum, any error in excluding defendant from the courtroom during the final minutes of the sentencing hearing was harmless beyond a reasonable doubt.  (*Chapman, supra*, 386 U.S. at p. 23; see *In re Guoimar* (2016) 5 Cal.App.5th 265, 279 ["violation of [the] petitioner's right to be present at the resentencing was harmless beyond a reasonable doubt"]; *People v. Davis* (2005) 36 Cal.4th 510, 534 [concluding the defendant's absence from pretrial hearing was harmless beyond reasonable doubt].)

## DISPOSITION

The judgment is affirmed.


BANKE, J.


WE CONCUR:


HUMES, P. J.


LANGHORNE WILSON, J.


A165995; *People v. Watson*